**Victoria D'AGOSTINO, Plaintiff,**

v.

**Otis BOWEN, Secretary of Health and Human Services, Defendant.**

**No. 86 C 1369.**

United States District Court, N.D. Illinois, E.D.

Nov. 7, 1986.
On Reconsideration Dec. 26, 1986.

Selwyn Coleman, Roselle, Ill., for plaintiff.

Jack Penca, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Victoria D'Agostino ("D'Agostino") seeks judicial review of a final decision by Secretary of Health and Human Services Otis Bowen ("Secretary") denying D'Agostino's claim for disability insurance. D'Agostino initially applied for benefits under Social Security Act ("Act") §§ 216(i) and 223, 42 U.S.C. §§ 416(i) and 423.[1] When that application was denied D'Agostino elected to waive a hearing before an Administrative Law Judge ("ALJ"), choosing instead to have her claim decided on the evidence of record (Reg. § 404.948).[2]

On September 23, 1985 ALJ William J. Sheridan ("ALJ Sheridan" or simply the "ALJ") reviewed the record evidence and denied D'Agostino's application. D'Agostino then exhausted her administrative remedies in proper sequence by requesting review of the ALJ's decision (along with additional medical evidence of her disability) by the Appeals Council. When that request was denied December 27, 1985, D'Agostino brought this action against Secretary under Section 405(g).

As invariably occurs in these actions, which come to this Court on the administrative review record and a decision by Secretary, the parties have filed cross-motions for summary judgment. Alternatively D'Agostino seeks remand to Secretary for a hearing. For the reasons stated in this memorandum opinion and order, D'Agostino's application is remanded to Secretary for proceedings consistent with this opinion.

### Facts

D'Agostino, who was 57 when ALJ Sheridan denied her benefits application (R. 15), has a high school education (R. 30). She worked as a bank teller from 1967 to 1973 (R. 40, 43) and as an assistant librarian from 1974 to 1981 (R. 40, 42). Most recently, from 1981 until March 23, 1984, D'Agostino was a statistical clerk in the insurance business (R. 26, 40, 41), where her responsibilities included filing, mail distribution, typing and bookkeeping (R. 41). To perform those tasks D'Agostino had to walk three hours, stand one hour, sit four hours, bend frequently, reach occasionally and lift and carry heavy files (R. 41).

On January 29, 1984 D'Agostino was admitted to Central DuPage Hospital by her ophthalmologist, Dr. Cinefro, with the following complaints (R. 58):

> Two days prior to admission, [she] noticed a curtain effect over the lower visual field of her right eye, with a rainbow effect around it. The following day, there was a muddy appearance to the whole visual field....

She was diagnosed by Drs. Gieser (her surgeon) and Marshall (a consulting physician) as having a retinal detachment of the right eye (R. 60, 61). Surgery (right schleral buckle and cryopexy) was performed January 30, 1984, successfully repairing the detached retina (R. 65). Three days later D'Agostino was released from the hospital (R. 57).

On March 5, 1984 D'Agostino returned to her job as a statistical clerk and continued working until March 23 (R. 26), when she stopped because of eye strain, vision distortion and pain (id.). D'Agostino then applied for disability insurance, claiming those symptoms prevented her from working. Several expert opinions as to the nature of D'Agostino's ailments appear in the record:

> Because the streets are too busy and unknown to me, I am afraid to drive in Chicago. My eyes do not grasp situations as fast as they used to, so I fear for my safety and the safety of others, therefore I am signing the waiver for an oral hearing.

---

1. All further citations to sections of the Act will take the form "Section—," referring to the Title 42 numbering rather than to the Act's internal numbering. Regulations drawn from 20 C.F.R. will be cited "Reg. § —."

2. D'Agostino, who lives in Roselle, Illinois, explained the reason for her waiver (R. 83):

1. Dr. Gieser's March 11, 1985 report (R. 70)[3] said he had not seen D'Agostino since March 1984, at which time her right eye was a "little blurry."

2. On August 31, 1984 Dr. Cinefro examined D'Agostino (R. 77–78). He found best corrected vision of 20/25 in her right eye, with no abnormality or limitation in the field of vision. In addition he concluded no impairment was expected as to work-related activities (R. 77–78).[4]

3. On February 7, 1985 Dr. Vygantas, another treating physician, examined D'Agostino and diagnosed (R. 76) status post retinal detachment repair, peripapillary hemorrhage, perifoveal epiretinal membrane, myopia and mild arteriosclerotic retinopathy in the right eye. With best correction, he found vision in the right eye to be 20/50 and D'Agostino's prognosis "good." Dr. Vygantas observed vision in the right eye was impaired due to a "macula wrinkle," and he noted D'Agostino complained of headaches from eye strain. Dr. Vygantas advised D'Agostino not to do any heavy lifting (R. 76). Dr. Vygantas' March 20 letter to an insurance claim investigator for CNA Insurance (R. 84–85) summarized the results of the February 7 exam in more detail:[5]

> Further evidence was noted that there has been an anatomical alteration in the retina to substantiate her symptoms. Retinal pigment epithelial alterations with an intraretinal cyst has been noted as well as further surface wrinkling. These changes will produce visual alterations of metamorphopsia, micropsia, distortion as well as loss of central acuity.

> \* \* \* \* \* \*

The surgery Mrs. D'Agostino had for the repair of retinal detachment has resulted in surgical implantation of silicone material on the wall of the schlera. This results in scar tissue formation and a tightness around the ocular tissue and muscles. Subsequent movement of the eye or change in body position can result in pain discomfort and a pressure sensation. Frequently these symptoms become negligable [sic], unfortunately, however in some patients they persist and seem to be continually aggravating.

Dr. Vygantas concluded (R. 84) D'Agostino should be restricted from activities that cause "ocular jarring" through:

> sudden change in position, a jar, jolt, heavy lifting, running or anything else that produces a sustained rise in the pressure around the orbit and head.

In addition, while acknowledging he was not familiar with D'Agostino's work environment, Dr. Vygantas observed the visual symptoms and eye discomfort would be aggravated by (R. 85):

> any prolonged reading, scanning of detailed material as may be on a monitor or evaluating fine detailed print. Reading as maybe [sic] required in filing could also aggravate her symptoms.

In closing, Dr. Vygantas wrote (id.) he believed D'Agostino's symptoms were "genuine and definitely aggravated by the use of her eye in her present working environment."

4. At the request of another CNA Insurance agent, D'Agostino was examined by Dr. Finder September 21, 1985 (R. 86).[6] During that exam D'Agostino

---

3. Dr. Gieser made his report to Adjudicator Susan Sawers over the telephone. Then the information was typed on a "Telephone Report" form, which Dr. Gieser later signed.

4. Because the copy of Dr. Cinefro's report provided this Court is illegible, this opinion relies on ALJ Sheridan's summary of the report (R. 12). D'Agostino does not refer to the report in her memoranda.

5. That letter had not been part of the record before ALJ Sheridan, but D'Agostino submitted it to the Appeals Council with her request for review.

6. Like the letter from Dr. Vygantas, that letter from Dr. Finder was not reviewed by ALJ Sheridan (as it could not have been, for it was actually written to the insurance company then considering disability policy coverage on September 23, 1985—coincidentally the very date of the

complained of visual blurring, distortion of the right vision and persistent discomfort (in the form of aching pain around the right orbit, sometimes accompanied by headache) that becomes moderate to severe when she reads for more than a few minutes or does any "detail" work (*id.*). Dr. Finder found D'Agostino's corrected vision to be 20/30 O.D. (right eye) and 20/20 O.S. (left eye) (*id.*). He diagnosed eye pain, most probably resulting from her eye surgery, and said (R. 87–88):

> Before responding to your specific questions concerning the nature and extent of this lady's disability, I emphasize that I am following your direct instruction to consider "primarily ... objective findings as opposed to the patient [sic] subjective comments." Based upon objectively measurable data only, [D'Agostino] cannot be said to be visually disabled, either totally or in significant portion, from her regular occupation as a clerk.... I must add however that there is no way objectively to measure pain and that pain is often not accompanied by objectively observable signs. I cannot comment on the validity of disregarding subjective symptoms in the determination of disability for insurance purposes, but in a common-sense approach, this lady is presently disabled.

In closing Dr. Finder noted (*id.*):

[D'Agostino's] "overall prognosis" would appear to be quite favorable.... It does not seem probable to me that the pain she has on attempted use of the eyes will persist indefinitely.

ALJ's report). It too was submitted by D'Agostino when she sought review by the Appeals Council.

7. Reg. § 404.1520. *Johnson v. Heckler,* 769 F.2d 1202, 1209–13 (7th Cir.1985) has since then invalidated the second step of Secretary's formulation. That issue is now pending before the Supreme Court in *Bowen v. Yuckert,* —— U.S.

*Applying the Statutory-Regulatory Framework*

To establish an entitlement to disability benefits, a claimant must show he or she is "disabled." Section 1382c(a)(3)(A) defines an individual as disabled:

> if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months.....

*Garfield v. Schweiker,* 732 F.2d 605, 607 n. 2 (7th Cir.1984) summarizes Secretary's five-step test[7] for disability:

> The following steps are addressed in order. (1) Is the claimant presently employed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of the list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination the claimant is not disabled.

Once a claimant has demonstrated an impairment of sufficient severity to prevail at step 4, *Smith v. Schweiker,* 735 F.2d 267, 270 (7th Cir.1984) teaches:

> The burden then shift[s] to the agency to show the claimant retained the residual functional capacity to perform other work in the national economy.

In turn Section 1382c(a)(3)(B) defines "work which exists in the national economy" as:

—, 106 S.Ct. 1967, 90 L.Ed.2d 652 (1986), in which certiorari was granted to the Ninth Circuit, which had agreed with *Johnson* in *Yuckert v. Heckler,* 774 F.2d 1365, 1369–70 (9th Cir. 1985). In this case the ALJ ruled against Secretary at that second step, so the question of its validity becomes irrelevant for current purposes.

work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country.

That Section further mandates that in determining whether a claimant can engage in work that exists in the national economy, Secretary must disregard whether:

1. "such work exists in the immediate area in which [the claimant] lives"; or

2. "a specific job vacancy exists for [the claimant]"; or

3. "[the claimant] would be hired if he applied for work."

Thus Secretary must ignore existing economic conditions and actual hiring practices—even though those factors might diminish the claimant's real job prospects—and focus solely on the claimant's physical and mental ability to perform jobs that exist in the national economy.

In determining whether a claimant can perform work that exists in the national economy, Secretary will consider—in addition to the claimant's physical impairments (Reg. § 404.1561)—the claimant's age (Reg. § 404.1563), education (Reg. § 404.1564) and work experience (Reg. § 404.1565). ALJs typically look to the "Grid" (Reg. Subpart P, Appendix 2), medical-vocational guidelines that balance a claimant's physical limitations against his or her age, education and work experience. To determine whether work suited to the claimant's qualifications exists within the national economy, the ALJ may rely on government publications or the assessment of a vocational expert (Reg. § 404.1566).

Throughout all this statutory-regulatory process, a special standard applies where (as here) the claimant's problems are non-exertional—where pain is a principal (or even the sole) predicate for the asserted disability. Section 423(d)(5)(A) mandates a combination of the claimant's subjective complaints of pain with objective medical evidence that could reasonably be expected to produce such pain.

In all events, Secretary's decision must be upheld unless (1) the findings are not supported by substantial evidence or (2) Secretary has applied incorrect legal standards (Sections 405(g). *Richardson v. Pe-* *rales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), has defined "substantial evidence" as:

Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

To this point this opinion has spoken of the criteria applicable to decisions by "Secretary." As the rest of the analysis will demonstrate, the critical issue in this case is defining just who "Secretary" is for that purpose.

### ALJ Sheridan's Decision

Based on the medical evidence, ALJ Sheridan correctly determined (R. 13) D'Agostino was unemployed and suffered from a severe impairment, but she did not qualify as disabled under the list of impairments in Reg. Subpart P, Appendix 1. At step 5 of the sequential analysis the ALJ concluded (*id.*):

5. The claimant has the residual functional capacity to perform work-related activities except for work involving lifting more than 20 pounds occasionally and 10 pounds frequently (20 CRF 404.-1545).

\*   \*   \*   \*   \*   \*

7. The claimant's impairment does not prevent the claimant from performing her past relevant work

8. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e)).

In concluding that D'Agostino (R. 12):

regained the ability to perform her past relevant work as she did not have any medically significant distortion of vision or pain that would have precluded her from performing her past work[,]

ALJ Sheridan observed (*id.*):

1. Only Dr. Vygantas, among D'Agostino's physicians, placed a limitation on her work-related activities, and that limitation was simply that she could not do heavy lifting.

2. D'Agostino's "statement that she had disabling distorted vision and eye

pain are [sic] not supported by the objective clinical evidence of record."

### Decision of the Appeals Council

Reg. § 404.970(b) sets out the Appeals Council's procedure where additional evidence is submitted to it by a claimant following the ALJ's decision:

> If new and material evidence is submitted with the request for review, the Appeals Council shall evaluate the entire record. It will then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently in the record.

Although the Appeals Council did review the additional medical reports of Drs. Vygantas and Finder, it nevertheless denied D'Agostino's request for review, observing (R. 4):

> Dr. Vygantas stated that you had scar tissue formation as a result of surgical repair of a detached retina. He felt that your symptoms were aggravated by your present working environment which required prolonged reading, scanning of detailed material on a monitor, and in evaluating [sic] fine detailed print. Dr. Finder noted that you had good visual acuity. On an objective [sic] measurable basis, the physician was unable to say that you were visually disabled.
>
> Accordingly, the Council has concluded that there is no basis for changing the Administrative Law Judge's decision.

### Scope of Review

When the Appeals Council has declined to review an ALJ's decision, it is ordinarily the ALJ's decision (which becomes Secretary's final decision) this Court must review under the substantial evidence standard. But in a case such as this one—where additional medical evidence was submitted to the Appeals Council *after* the ALJ made his decision—it is the *Appeals Council's* decision that must be reviewed by this Court. Cf. *Murray v. Heckler,* 624 F.Supp. 1156, 1158–59 (D.D.C.1986).

That is necessarily so because the ALJ's decision was not based on *all* the evidence now offered by D'Agostino, and considered by the Appeals Council, in support of her claim. To put it differently, it is obviously immaterial whether the ALJ's decision, based as it was on an incomplete record, can be viewed as supported by substantial evidence. Were the applicable standard here like that on a motion for a judgment n.o.v., where all evidence pointing in the opposite direction may be ignored, the addition of such evidence before the Appeals Council might perhaps be immaterial. But "substantial evidence" must be viewed in total terms, not on what has become less than a full record. Hence Secretary's entire memorandum on the current motions, which (though it refers to the Vygantas and Finder letters) speaks throughout of substantial evidence in terms of the *ALJ,* is focused on the wrong target.

*Bauzo v. Bowen,* 803 F.2d 917, 923 (7th Cir.1986) (citations omitted) has just recapitulated the substantial evidence standard as applied in reviewing decisions of the Appeals Council:

> In reviewing the Appeals Council's decision, we must keep in mind how much evidence is needed for substantial evidence. Substantial evidence has been described as "more than a mere scintilla." It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. This court's duty is not to reweigh the evidence, decide the facts anew, or substitute our judgment for that of the Secretary. Nevertheless, we should not act as an uncritical rubber stamp for the Secretary's decision. A reviewing court must look at the entire record of the proceedings to determine whether there is substantial evidence supporting the Appeals Council's decision. The court should consider the following to aid its evaluation: the clinical findings of treating and examining physicians, the diagnoses of these physicians, the subjective evidence of pain and disability as testified to by the plaintiff and as observed by others, and the plaintiff's educational background, work history, and present age.

And just as importantly, the court must be given adequate grist for its reviewing mill. As *Bauzo*, at 923 teaches, just as an "ALJ's conclusions must be stated in a manner sufficient to permit an informed review[,]" so too must the Appeals Council's.

This Court's review of the entire record discloses the Appeals Council's decision is *not* supported by substantial evidence in those terms. ALJ Sheridan had concluded D'Agostino was able to perform her past work, based on his finding that her subjective complaints of distorted vision and eye pain were (R. 12) "not supported by the objective clinical evidence of record." But ALJ Sheridan did not have before him the unequivocal and detailed opinions of both Drs. Vygantas and Finder, each substantiating D'Agostino's complaints of pain caused by her eye surgery.

True enough, the Appeals Council claims to have considered that newly-submitted medical evidence in deciding whether the ALJ's finding was contrary to the weight of the evidence *currently* in the record. But it failed utterly to articulate a coherent basis for that decision. Instead it merely described Dr. Vygantas' opinion that D'Agostino's "symptoms were aggravated by [her] present working environment" (R. 4) and then inexplicably relied solely on Dr. Finder's statement D'Agostino was not "visually disabled" on "an objective [sic] measurable basis."

"To permit an informed review" (*Bauzo*, at 923), the Appeals Council should have articulated its reasons for crediting or rejecting particular sources of evidence (*Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir.1985), reviewing an ALJ's decision). It clearly failed to do so in the key area for decision.

There was absolutely no discussion by the Appeals Council of whether, much less why, it rejected or failed to consider the opinion of Dr. Vygantas, one of D'Agostino's treating physicians. As for the single statement of Dr. Finder offered as support for the Appeals Council's decision, at best it is ambiguous (what does "visually" disabled mean?). Especially in light of Dr. Finder's additional conclusion D'Agostino *is* disabled "in a common-sense approach," it requires a quantum leap to proceed from the not-"visually-disabled" statement to the conclusion that D'Agostino is able to perform her past work despite her pain. Indeed, Dr. Finder was careful to emphasize he was *not* considering D'Agostino's subjective complaints of pain—the very thing Congress has commanded Secretary to take into account.

Moreover, even if the one sentence of Dr. Finder's statement cited by the Appeals Council were not ambiguous at best, the Appeals Council would still need to explain its consideration of only the small part of Dr. Finder's opinion that supported its denial of review. See *Bauzo*, at 925 (Appeals Council must articulate "the basis for adopting the favorable part of [a physician's] assessment ... and rejecting the unfavorable part").

In sum, this Court finds the Appeals Council did not conform to the requirements of Reg. § 404.907(b) in an added-evidence case. Accordingly, the Appeals Council is directed to review—applying the standards articulated in *Bauzo*—ALJ Sheridan's decision finding D'Agostino able to perform her past work.[8] If the Appeals Council ultimately upholds ALJ Sheridan's decision in those terms, it must at a minimum articulate some reasoned basis for that decision after considering all the evidence. If it does not uphold the ALJ, it should explain why in the same way.

In view of the subjective nature of D'Agostino's complaints, as well as Dr. Finder's prediction her pain should not persist indefinitely, the Appeals Council may decide a hearing is appropriate so an ALJ may observe D'Agostino and discuss her complaints with her in detail. Of course, if it is decided on remand that D'Agostino is

---

8. This implies no criticism of the ALJ, who after all could deal only with what he had. Indeed that is why Secretary's current brief misses the mark in focusing on the *ALJ's* action in "substantial evidence" terms.

not capable of performing her past work (because of the extensive reading required), Secretary must then go to step 5 of the sequential analysis, determining whether D'Agostino is able to perform some other type of work despite her limitations.

### Conclusion

Both parties' motions for summary judgment are denied. Secretary's decision is vacated, and this case is remanded for further proceedings consistent with this opinion.

## ON MOTION FOR RECONSIDERATION

This Court's November 7, 1986 memorandum opinion and order (the "Opinion")[1] denied both parties' motions for summary judgment, vacated Secretary's decision and remanded for further proceedings consistent with that opinion. Now Secretary has filed a timely Fed.R.Civ.P. ("Rule") 59(e) motion for reconsideration of that judgment order. For the reasons stated in this memorandum opinion and order, this Court grants reconsideration and modifies its previous order: It instead directs the ALJ to review D'Agostino's additional medical evidence and then to reconsider his decision in light of that evidence.

As the Opinion reflected, this Court described its function on review as one of examining whether the Appeals Council's decision not to review ALJ Sheridan's ruling (which had found D'Agostino able to perform her past work) was itself supported by substantial evidence. D'Agostino had submitted additional medical evidence to the Appeals Council *after* the ALJ made his decision. Although the Appeals Council's brief opinion discussed that evidence, it denied review.

**1.** This opinion (1) will assume familiarity with the factual statement in the Opinion and (2) will follow the same usage of defined terms.

**2.** [Footnote by this Court] Secretary Mem. 3 suggests that result (the designation of the ALJ's decision as Secretary's final decision) is also compelled by Reg. § 404.981 (emphasis added):

Thus Opinion at 799 reasoned it was the Appeals Council's and not the ALJ's decision it should review:

[I]t is obviously immaterial whether the ALJ's decision, based as it was on an incomplete record, can be viewed as supported by substantial evidence.

Finding the Appeals Council's decision did not conform to the requirements of Reg. § 404.907(b) in an added-evidence case, Opinion at 800–01 remanded with instructions for the Appeals Council to review ALJ Sheridan's decision.

Secretary now urges:

1. It is the *ALJ's* decision, not that of the Appeals Council, the Opinion should have reviewed—because it was the ALJ's decision that had become Secretary's.

2. ALJ Sheridan's decision is supported by substantial evidence even when the additional medical evidence is considered.

Although on reconsideration this Court agrees with Secretary on the first point, it disagrees on the second.

██ Despite the seeming logic behind the Opinion's decision to review the Appeals Council's ruling, it is indeed true that ALJ Sheridan's decision constitutes Secretary's "final" decision. That is so because the Appeals Council's opinion said (R. 4):

The Appeals Council has concluded that there is no basis under the above regulations for granting your request for review. Accordingly, your request is denied and the administrative law judge's decision stands as the final decision of the Secretary in your case.[2]

Of course, only final decisions of Secretary are subject to this Court's judicial review under Section 405(g). *Califano v. Sanders*, 430 U.S. 99, 108, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977).

The Appeals Council may deny a a party's request for review or it may decide to review a case and make a decision. The Appeals Council's decision, or the decision of the [ALJ] if the request for review is denied, is *binding* unless you or another party file an action in Federal district court, or the decision is revised.

■ Accordingly this Court now concludes the Opinion should in fact have reviewed the *ALJ's* decision to determine whether, considering *all* the medical evidence (including all such evidence not put before the ALJ), that decision was supported by substantial evidence.[3] In this case that question must be answered "no" —and for the same reasons identified in the opinion.

Both Drs. Vygantas and Finder unequivocally substantiated D'Agostino's complaints of pain caused by her eye surgery. Thus, when that additional medical evidence is considered, it cannot be said substantial evidence supports ALJ Sheridan's finding that (R. 12):

> [D'Agostino] did not have any medically significant distortion of vision or pain that would have precluded her from performing her past work[.]

Indeed, the fact that ALJ Sheridan did not (because he had no chance to) review the highly significant additional medical evidence, and therefore did not have any opportunity to articulate any reason for rejecting it (unlike the Appeals Council), is all the more reason to find his decision not supported by substantial evidence.[4]

Accordingly the ALJ is directed to review that medical evidence and then reconsider the question whether D'Agostino is able to perform her past work.[5] If he decides she cannot, the ALJ must go to step 5 of the sequential analysis to determine whether D'Agostino is able to perform some other type of work despite her limitations.

---

**3.** That sort of metaphysical inquiry, when put to a barrister arguing before the House of Lords, is said to have prompted the response:

> M'Lord, your question puts me in mind of the question whether, if I had a brother, he would like potatoes.

Seriously, except for the clear harmless-error situation (in which the added evidence is patently insubstantial), the kind of review urged by Secretary is at odds with the entire philosophy of the Act—in which courts ought not to be launching into technical medical evaluations without the benefits of an ALJ's studied and articulated analysis. If the added evidence is, on the face of it, potentially significant on the disability issue, the whole notion of limited judicial review would seem to argue for an ALJ's evaluation of that evidence in the first instance.

**4.** Secretary Mem. 5–6 closely scrutinizes the opinions of Drs. Vygantas and Finder and suggests several reasons why they do not mandate a finding D'Agostino is unable to return to her former work. But that type of analysis must be done by the *ALJ,* and it must be done *before* he makes a decision. Such post-hoc rationalization by Secretary's lawyer cannot substitute for the ALJ's decision, and it really offends the statutory scheme. Secretary Mem. 5—6 also suggests Dr. Vygantas' opinion should not be considered because it predates the ALJ's decision and thus could have been, but was not, provided to the ALJ in the first place. Nothing in Reg. § 404.970 (see Opinion at 799), however, places such a time constraint on the submission of new medical evidence to the Appeals Council.

**5.** As Opinion at 800 noted, it may well be that the ALJ will need to conduct a hearing in view of the subjective nature of D'Agostino's complaints.